| 165 | 489 |
|-----|-----|
| 215 | 90 |

# American Tube & Iron Co. et al. *v.* Baden Gas Co., and W. S. B. Hays et al., Appellants.

[Marked to be reported.]

*Corporation—Capital stock—Contribution of property—Fraud—Burden of proof—Creditor's bill—Equity.*

The members of an unincorporated oil company having struck large gas wells and finding it necessary to obtain additional capital in order to transport their gas to market, organized a corporation. The value of their property was fixed at $500,000, and this was made the amount of the capital of the corporation. The members agreed among themselves that only $175,000 of the stock should be retained by them, and that the remaining $325,000 should be sold to secure working capital. This arrangement was carried out and all of the treasury stock subsequently sold. In paying for the stock subscription a device was resorted to. A half million of dollars was apparently raised on a note signed by the members of the oil company, and placed to the credit of the corporation in a bank as payment for the stock. It was checked back to the treasury of the oil company for the property bought by the corporation from the oil company. It did not appear that any fraud or concealment was intended by this device. *Held*, that the property contributed constituted a full payment for the stock issued to the members of the oil company, and that the device resorted to in making the transfer did not affect the rights of the members to have their stock considered as full paid.

In such a case where no fraudulent over-valuation of the property contributed to the corporation is alleged, the fact that subsequent operations demonstrated that the property was of very small value, did not throw on the original members the burden of showing that the sale to the corporation was in good faith on a reasonable belief of the value of the property.

Argued Oct. 26, 1894. Appeal, No. 23, Oct. T., 1894, by Hays et al., stockholders, defendants, from decree of C. P. No. 2, Allegheny Co., April T., 1888, No. 361, on bill in equity. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill to enforce payment of stock subscription.

The bill by the American Tube & Iron Co. and other plaintiffs named therein, sets forth that it was filed on behalf of themselves and such other creditors of the Baden Gas Co. as may unite with them, and alleges that the defendant, the Baden Gas Co., was organized under the provisions of the act of May 29, 1885, authorizing the organization of natural gas companies; that its capital stock was $500,000, divided into 5000 shares of the par value of one hundred dollars each; that the defendants subscribed and assumed to pay for shares in various amounts; that neither the ten per cent of the capital stock, nor any other portion of the subscription, was ever paid to the corporation; that plaintiffs are creditors of the Baden Gas Co. in various amounts, all of which, with interest thereon, is unpaid; that the Baden Gas Co. is insolvent and has no assets; that the board of directors of defendant company have refused to make a call for the unpaid capital.

Plaintiffs then pray that an account be taken by a master of the amounts remaining unpaid of the capital stock and that a decree be made against defendants requiring its payment.

The answer admits the organization of defendant company; admits subscription to capital stock of said company; denies that subscription to capital stock was not fully paid; admits the insolvency of defendant company, and that it has no assets, but alleges that said assets had been sold at the instance of plaintiffs in equity proceeding in C. P. No. 2, of Allegheny county, by a receiver appointed at the instance of plaintiffs; and denies that there is any unpaid capital stock of defendant company.

A general replication was filed and M. A. Woodward, Esq., was appointed master, who found the facts as stated in the opinion of the Supreme Court and recommended a decree in favor of plaintiffs with costs.

Exceptions by defendants were overruled and a decree entered, in an opinion by EWING, P. J.

*Errors assigned* were, (1) entry of decree, quoting it; (2) directing defendants to pay, etc.; (3) in not dismissing bill; (4) in not holding that defendants had paid subscriptions in full; (5) in not holding that plaintiffs could not claim that

defendants had not paid subscriptions in full, (6) after having sold the property purchased by defendants.

*P. C. Knox* and *D. T. Watson, Jas. H. Reed, T. D. Carnahan* and *Johns McCleave* with them, for appellants.—Defendants had the right to sell their property to the Baden Gas Co., it being such property as was essential to that company's business, and had the right, with the company's consent, to set off the purchase money against their liability upon the subscriptions to its capital stock: Lungren v. Pennell, 10 W. N. 297 ; Densmore Oil Co. v. Densmore, 64 Pa. 43 ; McElhenny's Ap., 61 Pa. 188 ; Thompson, Stockholders, ed. 1879, § 134 ; 2 Beach, Corp. § 557 ; 2 Morawetz, Corp. § 826 ; Peck v. Coal Co., 11 Brad. (Ill. Ap.) 88 ; Coffin v. Ransdell, 110 Ind. 417 ; Walburn v. Chenault, 43 Kans. 352 ; 23 Pac. R. 657 ; Young v. Iron Co., 65 Mich. 111 ; Crawford v. Rohrer, 59 Md. 599 ; Liebke v. Knapp, 79 Mo. 22 ; Wetherbee v. Baker, 35 N. J. Eq. 501 ; Bank v. Alden, 129 U. S. 372 ; Phelan v. Hazard, 5 Dil. 45 ; Coit v. Amalgamating Co., 14 Fed. R. 12 ; Coates's Case, L. R., 17 Eq. 169 ; Cook, Stocks, §§ 13, 18 ; Clark v. Farrington, 11 Wis. 321 ; R. R. v. Hickman, 28 Pa. 318 ; Phelan v. Hazard, 5 Dil. 45 ; Carr v. LeFevre, 27 Pa. 413 ; Waterhouse v. Jamison, L. R. 2 Scotch & Div. Ap. 29 ; Currie's Case, 32 L. J. Ch. 57 ; Carling's Case, L. R. 1 Ch. Div. 115 ; Nicholl's Case, 26 W. R., H. L. 821 ; Foreman v. Bigelow, 4 Cliff. 508 ; Spargo's Case, L. R. 8 Ch. Ap. 412.

The contract of Feb. 17, 1886, having been executed by the transfer and delivery to the gas company of all the property therein described, and the consideration therefor paid by the. gas company by crediting the subscriptions an equal amount, the transaction is binding upon all parties, in the absence of proof of fraud.

The burden of proving fraud is in this, as in all cases, upon those who allege it. Fraud is never presumed: Kerr, Fraud, 383 ; Phelan v. Hazard, 5 Dil. 45 ; Carr v. LeFevre, 27 Pa. 413 ; Bickley v. Schlag, 46 N. J. Eq. 533 ; Spargo's Case, L. R., 8 Ch. Ap. 412 ; Baglan v. Colliery Co., L. R. 5 Ch. 346.

Fraud is neither alleged nor proved here, nor is there evidence of overvaluation.

Even if there was evidence of overvaluation, such evidence

would not raise the presumption of fraud; 36 Cent. L. J., p. 94; Peck v. Coal Co., 11 Ill. Ap. 88; Walburn v. Chenault, 43 Kans. 352; 23 Pac. R. 657; Young v. Iron Co., 65 Mich. 111; Wetherbee v. Baker, 35 N. J. Eq. 501; Bickley v. Schlag, 46 N. J. Eq. 533; 20 Atl. R. 250; Boynton v. Hatch, 47 N. Y. 225; Boynton v. Andrews, 63 N. Y. 93; Douglass v. Ireland, 73 N. Y. 100; Tube Works Co. v. Gilfillan, 124 N. Y. 302, 26 N. E. R. 538; Coit v. Amalgamating Co., 119 U. S. 343; s. c., 14 Fed. R. 12; Bank v. Alden, 129 U. S. 372; Phelan v. Hazard, 5 Dil. 45.

Plaintiffs are estopped from questioning the validity of the contract under which the Baden Gas Co. acquired its property, and through which defendants paid up their subscriptions to its capital: Coffin v. Ransdell, 110 Ind. 417; Coit v. Amalgamating Co., 14 Fed. R. 14; Green's Brice's Ultra Vires, 181; Colville's Case, 48 L. J. (Ch.) 633; Miller v. Assn., 50 Pa. 32; Vick v. LaRochelle, 57 Miss. 602; Burke v. Smith, 16 Wall, 390.

*West McMurray, C. C. Dickey* with him, for appellees.—Defendants were legally bound to the payment of $500,000 in cash, because their subscriptions were open and unqualified: Ry. v. Stewart, 41 Pa. 54; Bailey v. Ry., 69 Pa. 340.

The stockholders can be compelled to pay in full for their stock. This doctrine results from the character of the capital stock of corporations. It is a trust fund. It exists for the benefit of creditors whenever their rights and interests require it. Its payment can be enforced in modes which are not available to the corporation without using its name: Lane's Ap., 105 Pa. 62; Sawyer v. Hoag, 17 Wal. 610.

Coffin v. Ransdell, 110 Ind. 417, is in direct conflict with Lane's Ap., 105 Pa. 49; Cornell's Ap., 114 Pa. 153; Upton v. Triblock, 1 Otto, 60; Bell's Ap., 115 Pa. 88, and a host of authorities in the other states. An examination of the Pennsylvania cases cited by defendant shows them to have been proceedings by purchasers of stock against promoters of the company, to set aside some fraud alleged in the dealings of the promoters with the company, and they do not have any bearing on cases of creditors' bills.

OPINION BY MR. JUSTICE WILLIAMS, Jan. 7, 1895 :

This bill was filed by creditors of the Baden Gas Company, a corporation organized under the act of 1885, known as the Natural Gas Act. The relief prayed for, and obtained under the decree appealed from, is an adjudication that the defendants are liable to the receiver for the amount of the capital stock of the Baden Gas Company subscribed for by each of them, and that they pay the same over in money for the benefit of the plaintiffs and other creditors of the corporation which is admitted to be insolvent. The defendants admit the fact that they were subscribers to the capital stock of the Baden Gas Company, but insist that their subscriptions were paid in full, in property transferred by them to the corporation, immediately after its organization. The liability of the defendants depends therefore upon their allegation of actual payment; and this can be intelligently determined only upon a careful consideration of the facts and circumstances attending the organization of the gas company, and their legal value.

The fourth finding of fact made by the learned master, adopted by the learned judge of the court below, and conceded on all hands to be correct, informs us that the defendants and others who composed the Baden Gas Company had been previously associated in business under the firm name of the Allegheny Oil Company. The master then proceeds in this finding to tell us that " The Baden Gas Company was organized to take the place of the said Allegheny Oil Company, and the said subscribers, soon after their incorporation, proceeded to sell and transfer the gas property and interests of the said Allegheny Oil Company and $300,000 of their subscribed stock to the said Baden Gas Company for a price equal to the corporate stock of the latter company, to wit, $500,000."

In the fifth finding of fact we are informed that the gas property and interests so transferred consisted of between four and five thousand acres of gas leases including two large producing gas wells, certain rights of way, ordinances for the introduction of gas into the boroughs of Freedom, Baden, Sewickley, Osborne, Glenfield, West Bellevue and Bellevue, and contracts for the supply of gas, and certain patents relating to the business of transporting gas. All this property belonged to the Allegheny Oil Company and was transferred by that.

company and the persons comprising it to the Baden Gas Company. The findings from the seventh to the eleventh inclusive inform us of the plan adopted for the organization of the corporation and the transfer to it of the property of the Allegheny Oil Company described in the fifth finding. The corporation was to be organized under the Natural Gas Act in order to secure the rights and franchises conferred by that act. Its capital stock was fixed at $500,000. The price of the property to be transferred to it was fixed at the same sum. The stock was to be paid for with the property, or the corporation was to pay for the property with its stock, which is exactly the same thing; but this arrangement was made subject to the condition that but $175,000 of the stock so issued should be retained by the members of the firm of the Allegheny Oil Company, while the remaining $325,000 of it should be returned or contributed to the corporation to provide it with a working capital in order to enable it to develop its leases, lay additional pipe lines, and embark in the business of supplying natural gas as a fuel to the city of Allegheny and the towns along its line.

The seventh finding assures us that the $325,000 of capital stock set apart to provide a working capital was actually turned into the treasury of the corporation and used in the manner contemplated. Shares amounting at par to $55,000 were sold for cash at eighty cents on the dollar and the proceeds used in the business of the corporation. The balance of the stock was used in the extension of its lines to Allegheny City; and at the date of the filing of this bill not one share out of the entire amount remained in the treasury undisposed of. But in the execution of the sale from the oil company to the Baden Gas Company and in the payment of the subscriptions to the capital, a clumsy device was resorted to. A half million of dollars was apparently raised on a note signed by the members of the oil company and placed to the credit of the treasurer of the corporation in the Fifth National Bank as payment for the stock. It was checked back to the treasurer of the oil company as payment for the property bought by the corporation from the oil company. The property was then conveyed, the stock issued and disposed of as already stated, and the note taken out of bank. Not a dollar in actual money was used in the

transaction, and what end was accomplished by all this idle ceremony it is impossible for us to see. But if it did no good we cannot see, in the absence of any finding of fraud intended or practiced, that it did any serious harm. We are to look at it in the light of all that was done in connection with the organization of the corporation for the purpose of gathering therefrom the real character of the transaction. Neither unnecessary formalities nor clumsy devices nor palpable mistakes in methods, should prevent us from looking down to the true character of a transaction and determining the rights of parties in accordance with the facts, rather than the forms or appearances they may seem to wear.

Let us turn then from the method of organization to the facts showing the situation of the parties, their general plan for the development of their property, the necessity for obtaining corporate powers, and the provision made for a working capital with which to enter upon the proposed corporate enterprise. The corporators had been partners. As such they had been engaged in procuring leases and drilling wells in search for oil. In this search they had not been successful; but two of the wells drilled by them proved to be valuable gas wells. This, taken in connection with other developments in the same general region, was well calculated to induce the belief that they were the possessors of a large and valuable gas territory that should be promptly developed and utilized or its value would steadily decline by reason of drainage from the operations of others. They could not utilize their gas without transporting it to a market. They could not transport it to advantage except as a natural gas company possessing the powers conferred by the act of 1885. This determined them to organize a corporation under the provisions of that act for the production and transportation of natural gas, and to transfer their gas wells and leases, covering over four thousand acres, to the corporation. When this had been decided on, the first question to present itself was how shall the partnership convey its property to the corporation so as to secure to its members the same relative interest in the stock of the corporation they now have in the partnership property? The next question was how shall we secure the necessary working capital to enable the corporation to go forward with the work of produc-

ing, transporting and selling natural gas? In a general way these questions were answered by the adoption of the scheme which the master and the court below have characterized as a sham. The value of the property, rights of way, municipal grants, and patents held by the firm was set down at $175,000; the working capital needed at $325,000. To meet both purposes the capital stock of the corporation was fixed at $500,000. It was all to be issued as paid-up stock in exchange for the property conveyed to the corporation, subject to the agreement that all except the $175,000 was to be contributed to the treasury to be sold as a means of raising the money needed for a working capital.

Now let it be conceded that this was neither the safest nor most business-like way of securing a working capital. Let it be conceded further that the use of the note in the Fifth National Bank and the ceremony of first crediting and then debiting the treasurer with a half million of dollars without the handling of a dollar in money, was an unfortunate device liable to be misunderstood and calculated to excite suspicion. The question remains, nevertheless, for our consideration, was it the method actually adopted for the accomplishment of the ends in view? There is no suggestion by the master that it was fraudulently intended or that it was not faithfully carried out. On the contrary he finds in the twelfth finding of fact that the "Baden Gas Company never made any calls upon its subscribers for any payment upon their stock, but treated the bank credit transaction set forth as payment in full upon the said stock." It is evident therefore that, whether wise or unwise, the scheme we have outlined was that which these parties actually adopted and upon which they acted in good faith.

In the seventh finding of fact we learn also that the whole amount of the $325,000 contributed in stock as a working capital was sold or used in the extension of the pipe lines of the corporation and the prosecution of its business in producing and transporting natural gas. The learned master however lost sight of his own findings of fact, for in his first finding of law he says: "I cannot however see anything but an idle performance in the use of these notes, credits and checks, or in any temporary shuffling of money, had that been done;" and

then from the fact that these notes, credits and checks were used, he draws the conclusion on which the decree he recommends rests, in these words : " I hold therefore that those transactions did not effect any payment whatever upon the stock subscribed by the defendants." In other words because an "idle performance" was unnecessarily resorted to, the meaning and understanding of the parties who were unwise enough to indulge in it must be disregarded and they must be punished by being compelled to pay a very large sum of money for having failed to adopt a better method for effecting a legal and an honest purpose. The learned judge who made the decree seems also to have been misled by his indignation at what he characterized as " a thin pretext and a sham," although he had no difficulty in recognizing the real character of the transaction. In the opinion first filed by him he says, referring to the arrangement between the firm known as the Allegheny Oil Company and the corporation, " this was in legal effect and in fact a sale to the gas company, of this property included in the agreement, for $175,000 of paid up stock and not for $500,000, the nominal consideration." Again in the second opinion he repeats this statement and says that " the property was in fact taken for payment of $175,000 of the stock subscribed and the remaining $325,000 was to be put on the market as paid up stock and sold for whatever it would bring." This means, of course, sold for the benefit of the gas company, and to provide it with a working capital.

In what respect then have the defendants failed in the performance of their undertaking to the Baden Gas Company ? The shares of stock nominally issued to them, but to be returned into the treasury of the company for sale for its benefit, have been so returned by them and have been actually disposed of by the company in the prosecution of its enterprises and the extension of its pipe lines. The shares of stock which they were to retain as the price of the gas wells, leases, patents, rights of way, and other property of the Allegheny Oil Company were paid for in full in accordance with the written agreement entered into by the parties and delivered to the defendants as paid-up stock. The gas company has no claim on the defendants therefore resting in contract, and there cannot be found in the bill or the findings any averment of fraud in fixing

the price of the property sold, or the total amount of the Gas Company's stock or the general plan of organization. The uselessness and clumsiness of the machinery employed are characterized by such expressions as idle ceremony, thin pretext, sham, shuffling, and the like; but the real purpose stood out so plainly that neither the master nor the learned judge failed for a moment to grasp it fully. The scheme was to turn over all the gas wells, leases and property connected therewith to the gas company for $175,000; and provide it with the means of prosecuting the gas business by putting into its treasury paid-up stock, or what should be sold as paid-up stock, to the amount of $325,000 more. This may have been bad financiering, but that is not enough to support this decree. It may have been an irregular and mistaken method for reaching the purpose in view, but that does not change the fact that the property was agreed to be taken, and was in fact taken, as full payment of the stock subscriptions made by the defendants.

The learned judge felt the stress of the situation and found relief in the proposition " that the facts in evidence, connected with the fact that within a few months it was demonstrated that the property was of very small value, threw on the defendants the burden of showing clearly that the sale from themselves to themselves was in good faith on a reasonable belief of the value of the property." But what has the fact that, after some months spent in development of their territory, the corporation found itself disappointed in its productiveness and a heavy loser in consequence, to do with the good faith of their purchase, or the reasonableness of the price? These are to be judged of by the facts before them when the arrangement was made. The character of the gas wells already opened, the extent of the territory covered by the leases, its relation to other developments, its nearness to an adequate market, and the probable duration of the supply within reach, were the considerations that would affect the judgment of buyers and sellers and of the business public as to its value. The subsequent disappointment must therefore be left out of the case and the transaction examined in the light in which it was seen when the agreement was entered into. When this is done, and the absence of any suggestion or finding of fraud is remembered, it is not easy to see what there is in the case to shift the

burden of proof, or to require the defendants to establish the good faith of a transaction which the plaintiffs have not attacked. The bill proceeds on the theory that the subscriptions to the capital stock are wholly unpaid. The proofs show that they were paid exactly in accordance with the agreement, and that this payment had been recognized by the corporation from the first. The decree finally made seems to rest on the conclusion of the court below that although paid they were paid in property which was taken at too high a price. It is true that no such thing was alleged in the bill, or shown by the proofs, but if the value of the property is to be determined in the light of subsequent events, a light which the parties did not have when this sale was arranged, the conclusion of the learned judge is a reasonable one. The trouble with it however is, that it rests on the intrinsic value of the property as ascertained by actual developments made after the sale, while the real question relates to the apparent value as indicated by the circumstances existing at the time of the sale. We do not differ from the learned judge in the conclusions to be drawn from the evidence so far as they give character to the transaction. We agree that the evidence shows a sale of the property of the Allegheny Oil Company to the Baden Gas Company for $175,000 ; and that the arrangement in regard to the remaining $325,000 was not for the benefit of the stockholders as individuals but of the corporation, and was intended to enable the company to provide itself with funds for the prosecution of its business. We quite agree also that the evidence shows the $175,000, the par value of the stock taken by the corporators, was actually paid in property in accordance with a written contract entered into between the corporation and the partnership for the sale of the wells, leases, and other property of the oil company to the corporation. We should also agree with the learned judge that the property was sold at more than its actual value, if that value was to be determined by subsequent results rather than by the prospects as they appeared at the time of sale. But if the parties were mistaken in relation to its value, we do not see how, in the absence of any averment of fraud in the transaction, the sale can be disregarded and the subscriptions to the capital stock treated as unpaid. The proofs show that they were paid exactly in accordance

with the agreement under which they were made, and until that agreement is attacked as fraudulent, the creditors stand in no better position than the corporation itself.

The decree is reversed so far as it requires payment of the stock subscriptions or any part thereof. It is allowed to stand as to costs.

And now, October 26, 1894, this appeal came on to be heard and was argued by counsel, whereupon, on consideration thereof, it is ordered, adjudged and decreed that the decree be reversed except in so far as it relates to the payment of costs, and that the bill be dismissed.