In re SCHUYLKILL–HEIM BREWING CO.

(District Court, E. D. Pennsylvania. October 1, 1913.)

No. 4,085.

1. CORPORATIONS (§ 216\*)—LIABILITY OF STOCKHOLDERS—LAW GOVERNING.

The liability of stockholders of a bankrupt corporation on account of payment for their stock in property is to be determined by the law of the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 829–834; Dec. Dig. § 216.\*]

2. CORPORATIONS (§ 232\*)—LIABILITY OF STOCKHOLDERS—PAYMENT FOR STOCK IN PROPERTY.

Stockholders of a brewing company, who paid in part for their stock by an agreement to transfer the good will of their business as wholesale dealers in beer to the company, *held* liable to assessment for such part of the subscription on the bankruptcy of the company, under the law of Pennsylvania; it not appearing what, if anything, such good will was worth.

[Ed. Not.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. § 232.\*]

In the matter of the Schuylkill-Heim Brewing Company, bankrupt. On exceptions to report of special referee respecting liability of stockholders. Report confirmed.

Arthur L. Shay, of Pottsville, Pa., for trustees.
John F. Whalen, of Pottsville, Pa., for exceptants.

---

J. B. McPHERSON, Circuit Judge. The nature of this controversy will appear from the following report of the learned referee (Samuel E. Bertolet, Esq.):

"(1) The Schuylkill-Heim Brewing Company was adjudged bankrupt on June 23, 1911, and the liabilities proved and allowed against the estate within the year fixed by law, are $31,384.20. The assets realized from all sources are and will not exceed $18,826.45, from which must be deducted administration expenses and costs, leaving net assets of not over $15,027.79. The secured claims paid in full total $11,485.17, leaving about $3,542.62 for distribution among unsecured creditors, whose claims total $19,899.03. Allowing for additional expenses, it will thus take about $16,000 to pay creditors in full.

"(2) Chas. Amann, some time before 1910, took title to about 50 acres of land in Schuylkill county, near Ashland. He and Martin Heisenberger began the construction of a brewery plant thereon. Amann was the moving spirit in the enterprise. Heisenberger advanced about $4,500 toward the project, and Amann put in additional sums until the amount contributed by both aggregated about $17,660. The construction of the brewery proceeded until early in 1910, when the superstructure was completed, including the installation of a boiler. Up to that time, no machinery had been installed.

"(3) Early in 1910, Amann conceived the idea of organizing a corporation and taking into the project Michael J. Hanley and Thos. R. Bennett, partners in a beer and liquor distributing business which they had established in the community. He agreed to give them an equal interest in the project with himself and Heisenberger, if they would pay $5,000 for their share of the stock of the proposed company and divert their business to it. This business Hanley testifies was worth $4,500 a year in profit to the company. The stock was to be shared equally between the four men, and Amann and Heisenberger were to turn over their interest in the brewery, for their stock.

"(4) On March 4, 1910, a meeting was held, attended by Amann, Heisenberger, Hanley, and Bennett, at which they agreed to apply for a charter for the proposed corporation, the capital stock to be $70,000, divided into 1,400 shares of $50 each. Each of the four were to and did subscribe for 350 shares each. On March 16, 1910, another meeting was held, the minutes of which state that 10 per cent. of the capital had been paid to the treasurer in cash. As a matter of fact this $7,000 was not at the time paid.

"(5) An application for a charter was prepared and filed, in which Amann, Heisenberger, Hanley, and Bennett certified that they had subscribed for 350 shares each of the capital stock of the company, and that they four were the directors of the company. The charter was granted on April 26, 1910, and recorded May 2, 1910. Bennett was elected president, Hanley, vice-president, and Amann, treasurer.

"(6) On May 17, 1910, Amann at a meeting of the four directors reported that he would convey the brewery plant, three acres of land on which it stood, and the brewer's license held by him, to the company for $40,000. This offer seems to have been accepted, for on June 17th the minutes of a directors' meeting show that the company's solicitor was directed to prepare a deed for the property, conveying it from Amann to the company. The deed was executed June 25, 1910, and duly recorded.

"(7) In order to enable the company to distribute its stock among hotel men, and thus stimulate its business, the four incorporators returned their 350 shares of stock to the company, and each received instead a certificate for 200 shares, par value $10,000. They continued to hold this stock to the date of the bankruptcy of the company. Out of the remaining 400 shares about $5,500 worth, or 110 shares, were sold to a number of other subscribers, who paid for their stock in cash at par; the company receiving the money.

"(8) Hanley and Bennett together paid in cash for the 400 shares of stock in their name the sum of $4,300 in the following installments: On March 15, 1910, $1,000; June 21, $500; July 5, $1,000; July 23, $200; July 30, $300; and August 3, $1,300. They admit that they each owe $350 on their agreement to pay $5,000 for their stock.

"(9) Amann and Heisenberger, as payment for their shares, jointly contributed the brewery property and three acres of land, on which $17,660 had been expended, and which was offered to and accepted by the directors of the company at $40,000. Later, and at various times from May 12 to October 9, 1910, Amann advanced to the company from his private funds $2,153 in cash. Amann was to receive a mortgage for $5,000 difference between the $35,000 worth of stock he and Heisenberger received originally and the transfer price of the brewery. It was never given to him.

"(10) In September, 1910, Amann, Heisenberger, Hanley, and Bennett indorsed a note for $6,000 given by the bankrupt, and in November, 1910, another note for $1,000. These notes were paid by them after the bank holding the notes sued the indorsers. They paid $7,146.80, principal, interest, and costs, and took an assignment of the judgment against themselves, from the bank. Each indorser paid one-fourth, or $1,786.70.

"(11) On February 23, 1912, the referee (Freiler) allowed the claims of Amann, Heisenberger, Hanley, and Bennett for $1,786.70 each, being their payments made as indorsers of the bankrupt's notes plus interest. Amann had offered a claim for a much larger amount, including the $5,000 difference between $35,000 in stock received and $40,000, the transfer price of the brewery, and including also the $2,153 in cash advanced by Amann at various times. Allowance of this part of his claim was deferred. No review was taken from the referee's order allowing these claims. Only an exception was noted by counsel for the trustees, to the referee's rulings.

"Discussion.

"The four incorporators, Amann, Heisenberger, Hanley, and Bennett, agreed before incorporating the company, that its capital stock should be $70,000, divided into 1,400 shares, and that each were to take 350 shares. Of these 350 shares, 150 were to be returned to the company to be sold to others, and 200 kept by themselves.

"For their 200 shares of stock, Amann and Heisenberger were to turn in the brewery property, which had been constructed with their money at a cost of $17,660, plus three acres of land on which it stood. Amann, in whose name title to the real estate was held, also agreed to turn over, with the court's consent, his brewer's license, and, in addition, to concede to the company certain water rights originating upon the remaining land from which the brewery lot had been carved. Hanley and Bennett, for their 200 shares each, were to pay $5,000 in cash and turn over their beer business, or, more properly speaking, its 'good will.'

"All this was, as the testimony seems to me to clearly show, done and agreed to before the company was incorporated. It remains to see, then, whether, after incorporation, the bargain was properly ratified and executed by and between the four incorporators, who held all the stock and offices of the company, and the corporation. To this end we must inquire (1) whether the property was fairly worth the $20,000 worth of stock each pair of stockholders received, and (2) whether the necessary precautions were in good faith taken by those representing the company to make the transaction lawful and prevent liability by these stockholders to the creditors of the now insolvent company.

"That the capital stock of a corporation can be issued to the subscribers to its stock in return for money, property, or services received is, in general, a proposition too well settled to require the support of authorities. It seems only necessary for a stockholder to show that the property or services were not grossly and fraudulently overvalued, but fairly ascertained, that the proposition for its acquisition was fairly submitted to the company, and that the latter received the property, etc., in pursuance of the agreement for its transfer in exchange for stock, with an honest belief on the part of those representing the company that it had the value placed upon it, bearing in mind that such value is not to be determined by subsequent results, but rather by the prospects as they appeared at the time of sale (Iron Co. et al. v. Hays et al., 165 Pa. 489, 30 Atl. 936), and bearing in mind, too, what was said in Bole v. Murray, 233 Pa. 589, at page 597 [82 Atl. 943, at page 946],

'Where an original subscriber to stock claims to have paid a subscription in something else than money, the burden is on him to show a contract with the corporation permitting it, and the further burden is on him of showing that the transaction was fair, and that the property turned over in payment had been valued by those representing the corporation in good faith.'

"With these principles in mind let us first direct our attention to the Amann and Heisenberger stock, and its alleged payment. As said before, the only stock these men actually received was 200 shares each, or $20,000 worth. It is undoubtedly a fact that the brewery building cost them jointly $17,660, and that the land on which it stood was worth something, that the license to brew beer on the premises had value, and that the water right was an asset. To say that this combined property, coupled with the prospects of profit from the project as they appeared at the time of sale, was reasonably worth $20,000, and could be so regarded by the directors of the corporation, · is surely not drawing upon one's imagination. That they were so regarded, and that a contract to take the property as it thus stood was recognized as existing, whether in writing or by parol, between Amann and Heisenberger and the corporation, seems to me to be clearly shown by the minutes of the May 17, 1910, meeting of the directors, when Amann offered to convey it all to the company for $40,000, which offer was accepted and the sale ratified by the meeting of June 17th, when the company's solicitor was directed to prepare a deed conveying the property to the company. It is true that the purchase price was fixed at $40,000, but what of that? The stock to be exchanged for the property was $20,000 worth, and the only thing for us to determine is whether it was fairly worth that amount, and whether the directors were justified in parting with so much of their company's stock in return for it. It seems to me the question must be answered in the affirmative. That the price named in Amann's offer and in the deed was twice as much as the value of the property seems to me is of no more significance than if the consideration named had been a merely nominal one. Assuming that Amann was endeavoring to exact more for the property than it was worth, the fact remains that he did not receive it, and the evidence is ample to show that the company persistently refused to accede to his demands for additional remuneration in the shape of a mortgage for $5,000. The sole point on this phase of the case is that the company got property fairly worth the stock it gave in return, that it had reason to and did believe it to be worth the consideration actually given, and that it executed the transaction in a legitimate way. It and its creditors must stand by the results.

"I am therefore of the opinion that Amann and Heisenberger held their stock fully paid, and are not liable to assessments upon it. It follows, in consequence, that such claims as they may have against the estate must be permitted to share in dividends. Heisenberger's has been allowed for $1,786.70. Amann's has been allowed for a similar amount, with leave to prove the balance. I think he has clearly shown loans to the company amounting to $2,153, which must be added to the sum already allowed. He attempts, however, to prove for $5,000 more, an amount he alleges to be due on a promise made by the company to give him a mortgage for an alleged balance due him on the purchase price of the brewery. Having just said that the property turned in by him was worth $20,000, for which he and Heisenberger received payment in stock, I do not think he can be allowed this part of his claim, and an order will be entered accordingly.

"This leaves the case against Hanley and Bennett to be disposed of. Here I think an entirely different conclusion must be reached. Their $20,000 worth of stock was to be paid for by $5,000 in cash and the turning over of their beer business to the company, which I have heretofore designated as 'good will.' The evidence shows and it is conceded that each of these two men paid only $2,150 on account of their stock. Assuming that they had to pay only the $5,000 testified to, they would still owe $350 apiece. I am not, however, convinced that payment of the balance of their stock, viz., $7,500 each, by 'good will,' has been made. It may be allowed that 'good will' is property, and as such can be used in payment of a stock subscription. Washburn v. Natl. Wall Paper Co., 81 Fed. 17, 26 C. C. A. 312 (C. C. App. 2d Cir.). But I do not think that the Hanley and Bennett transaction has in this regard been

shown to be within the rules of law as heretofore laid down. There is no evidence of its fair valuation by the parties. It was put in at $15,000 without any attempt having been apparently made by any one to show that it was worth that much money, or, for that matter, was worth anything. And, in truth, was it really worth anything? The business built up by Hanley and Bennett was in the sale of beer made by a brewery called Feigenspan's. How could any one tell that the customers who had given Hanley and Bennett their patronage while they sold Feigenspan beer would continue to patronize them after they began distributing an entirely different and perhaps inferior product? It seems to me that the value of this property was decidedly speculative, and incapable of appraisement or estimation. Such estimation was not, in fact, made either by the company or by Hanley and Bennett, at the time of the transaction, so far as the testimony shows. Also, the testimony is entirely void as to any contract or undertaking by the company to take this item of property in exchange for its stock. In these respects the case differs completely from that involving the Amann and Heisenberger stock, where the minutes of the corporation plainly indicate corporate intention to take property in exchange for stock. As was said in Bole v. Murray, supra, the burden was on Hanley and Bennett to show a contract with the company permitting payment of their stock in this way, to show that the transaction was fair, and to show that the 'good will' transferred by them had been valued by those representing the corporation. In the bearing of this burden I think they have failed, and I shall have to hold that they owe $7,850 each on their stock, a total of $15,700. As this amount will not pay creditors in full, it follows that they must be assessed the whole debt due by them.

"They have each presented claims against the estate, and their claims were allowed for $1,786.70 apiece, by the referee preceding me in charge of this case. These allowances were not reviewed, and must therefore be taken as final. But they cannot be set off against the claimants' liability for unpaid stock. Both Hanley and Bennett must pay their assessment before they can receive dividends, and the latter will not be distributed to them so long as they have not paid up their stock in full.

#### "Conclusions.

"(1) Chas. Amann and Martin A. Heisenberger are not liable for stock held by them, the same having been fully paid.

"(2) Michael J. Hanley is the holder of 200 shares of stock of the bankrupt company, on which he has paid $2,150 and owes $7,850.

"(3) Thomas R. Bennett is the holder of 200 shares of stock of the bankrupt company, on which he has paid $2,150 and owes $7,850.

"(4) The total unpaid debts of the bankrupt company, after distribution of all dividends, will be at least $20,000.

"(5) A call must be made upon Michael J. Hanley and Thomas R. Bennett for the entire amount due by them on the stock held by them, to wit, $7,850 each, and an assessment must be levied against said persons for said amounts.

#### "Recommendations.

"I respectfully recommend that the court enter the following order on the petition of S. M. Enterline, Roscoe R. Koch, and J. D. McConnell, trustees in bankruptcy of the Schuylkill-Heim Brewing Company, bankrupt: It is on this ――― day of ―――, 1913, ordered, adjudged, and decreed that the petition of S. M. Enterline, Roscoe R. Koch, and J. D. McConnell, trustees of the Schuylkill-Heim Brewing Company, bankrupt, praying, inter alia, that a call be made for an unpaid balance alleged to be due by Charles Amann, Martin Heisenberger, Michael J. Hanley, and Thomas R. Bennett on stock of the bankrupt corporation held by them, and that an assessment be levied against said persons for the amount alleged to be unpaid on the capital stock held by them, or so much thereof as may be necessary to pay the ascertained debts of the corporation, be dismissed as to Charles Amann and Martin Heisenberger; and that a call be made upon Michael J. Hanley to pay $7,850, and upon Thomas R. Bennett to pay $7,850, due by them, respectively, upon stock

of the bankrupt corporation held by them; and that an assessment be levied against said Michael J. Hanley and Thomas R. Bennett for the amount remaining unpaid upon 200 shares of the capital stock of said corporation held by each of them; and that the costs of this proceeding be equally divided, the estate to pay one half and said Hanley and Bennett the other half, or in such other form as the court may deem proper."

[1, 2] To this report Hanley and Bennett have excepted, and the question for decision is whether the referee was right in recommending that an assessment should be levied upon their stock. Little need be added to the foregoing report, which states the facts clearly, and in my opinion reaches the proper conclusion. It is argued that the Pennsylvania decisions do not control, and that the exceptants are entitled to hold their stock as full-paid, because the business of the exceptants was actually turned over to the brewing company, and the company profited thereby. But the argument overlooks the fact that the rules laid down by the Supreme Court of Pennsylvania are not intended primarily to protect the company itself, but the creditors of the company; and it is obvious that creditors are, or may be, injured by the violation of these rules, even if the property contributed should actually be enjoyed by the company. I agree with the referee that the Pennsylvania decisions have settled the question now presented.

The clerk is therefore directed to enter the order recommended by the referee, dating it October 1, 1913.